**DISTRICT INTOWN PROPERTIES LIMITED PARTNERSHIP, et al., Plaintiffs,**

v.

**The DISTRICT OF COLUMBIA, et al., Defendants.**

Civil Action No. 96–569–LFO.

United States District Court,
District of Columbia.

Sept. 25, 1998.

Wallace Albert Christensen, I Stacey Lynn McGraw, Ross, Dixon & Masback, L.L.P., Jay Ward Brown, Levine Pierson Sullivan & Koch, L.L.P., Washington, DC, for Plaintiff.

Melvin W. Boldin, Jr., Office of Corporation Counsel, D.C. Washington, DC, for Defendants.

## *MEMORANDUM*

OBERDORFER, District Judge.

Plaintiffs, a limited partnership and its partners, bring this action under 42 U.S.C. § 1983 on the ground that the District of Columbia has taken their property without

just compensation. The undisputed facts are that in 1961 plaintiffs purchased in fee simple Lot 1 of Subdivision Square 2106 (hereinafter "Lot 1"). Known as Cathedral Mansions South, Lot 1 consisted of an apartment building and adjacent landscaped lawns. Cathedral Mansions South was built by local developer Harry Wardman in the early 1920s as part of his larger Cathedral Mansions project. Defendants assert, and plaintiffs do not contest, that Lot 1 was maintained by plaintiffs and their predecessors as a single taxable lot from 1922 until 1988. At that time, twenty-seven years after they purchased Lot 1, plaintiffs caused it to be subdivided and recorded as separate lots: Lot 106, which included the improvements on the original site, and eight smaller contiguous lots (Lots 107–114) carved out of the landscaped lawn.

In December 1988, following the subdivision, plaintiffs applied for building permits to construct one single-family townhouse on each of Lots 107–114. On February 14, 1989, plaintiffs' applications were referred to the United States Commission of Fine Arts ("Commission"), as a portion of Cathedral Mansions South faces the Zoological Park, a federal property protected by the Shipstead–Luce Act. *See* D.C.Code § 5–410 (1994) (effective May 16, 1930). The Commission ultimately recommended disapproval of the applications for reasons both practical and aesthetic. *See* Pls.' Mot. for Summ. J. Ex. B–4.

On March 2, 1989, while plaintiffs' permit applications were still pending, an application was filed with the District of Columbia Historic Preservation Review Board ("Board") to designate as an historic landmark the entire Cathedral Mansions complex, including Lots 106–114. Under D.C.Code § 5–1002(6)(B), properties for which historic landmark applications are pending are treated as landmarks for purposes of the Historic Landmark and Historic District Protection Act of 1978, D.C.Code § 5–1001 *et seq.* (the "Land-

mark Act"). Accordingly, on March 7, 1989, plaintiffs' applications were referred to the Board for review and recommendation.[1]

On May 17, 1989, the Board acted on the landmark application, voting to designate Cathedral Mansions, including Lots 106–114, as an Historic Landmark in the District of Columbia Inventory of Historic Sites. It described the complex as containing three Georgian Revival style buildings

> sited imaginatively to provide the greatest possible integration of living space with well-landscaped open space. Individual apartments were designed where possible to include multiple exposures with large areas of fenestration, sun rooms and French doors opening onto sheltered patios and balconies. Cathedral Mansions is designed in the context of Connecticut Avenue and nearby parkland including the National Zoo and the Rock Creek and Klingle Valley ravines. It contributes significantly to the unique open space character of Connecticut Avenue in which single family and multi-family residences complement each other and are integrated and enhanced through a continuity of designed and natural landscape.

Pls.' Mot. for Summ. J. Ex. B–5 at 1. In support of its landmark designation, the Board noted that Cathedral Mansions was "an early and fine example of a large apartment complex in a park-like setting" and a "notable work of Harry Wardman, one of the most prolific and influential developers of residential property in the history of the District of Columbia." *Id.* at 2.

In July 1989, the Board held a hearing on plaintiffs' building permit applications, and recommended that they be denied on grounds that the "construction of eight new townhouses on the open space is not consistent with the purposes of Section 2(b) of D.C. Law 2–144, Historic Landmark and Historic District Protection Act of 1978." Pls.' Mot. for Summ. J. Ex. A–12. Plaintiffs initially;

---

1. Plaintiffs repeatedly assert that "zoning approval" was obtained on March 7, 1989, the date on which their applications were forwarded to the Board. However, the transmittal letters to the Commission, Pls.' Mot. for Summ. J. Ex. B–2, indicate that "zoning approval" and "structural approval" were certified as early as February 15, 1989. Plaintiffs' emphasis to the contrary, it is not clear from their evidence that "zoning approval" of this type has any significance, apart from the fact that it is one of numerous considerations that determine whether a building permit will be issued.

sought a hearing before the Mayor's Agent to review the Board's decision; however, their permit applications were dismissed without prejudice by the Mayor's Agent in an "Uncontested" Decision and Order of December 20, 1991.

In January 1992, plaintiffs once again submitted applications for permits to build townhouses on Lots 107–114. Upon referral, the Board again denied plaintiffs' applications as inconsistent with the landmark status of Cathedral Mansions. On March 8, 1993, the Mayor's Agent affirmed the Board's decision, and signed an order denying plaintiffs' building permit applications, concluding that the proposed construction was incompatible with the Cathedral Mansions landmark because it "would result in the destruction" of the lawn, which is "an integral part of the landmark."[2] Pls.' Mot. for Summ. J. Ex. B–1 at 12.

In the instant action, plaintiffs do not contest the decisions of the Board or the Mayor's Agent. Nor do they challenge the Historic Landmark and Historic District Protection Act itself. Rather, they assert, pursuant to *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), that defendants have effected a "total taking" of their property – or more specifically, of Lots 107–114 – for which they are entitled to just compensation. Defendants assert that no taking has occurred because plaintiffs failed to exhaust their administrative remedies and because they have not been deprived of all economic benefit from the property. Pending are cross-motions for summary judgment.

## I.

Before a regulatory taking claim brought against a state entity is ripe for decision in federal court, the claimant must demonstrate that: (1) the responsible state agency has made a final decision as to "application of the [challenged] regulation to the property at issue"; and that (2) the claimant has "sought" compensation through available state procedures. *See Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 1664–65, 137 L.Ed.2d 980 (1997); *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Defendants, in effect, contend that plaintiffs satisfied neither prerequisite because they "elected to by-pass" procedures that would have permitted the Mayor's Agent to consider plaintiffs' claims of economic hardship prior to issuing his final order. *See* Defs.' Mot. for Summ. J. at 12. Defendants' contention is not supported by governing District of Columbia law.

The Landmark Act contains separate provisions concerning applications for "Demolitions," "Subdivisions," "Alterations," and "New construction" within an historic district or on the site of an historic landmark; at issue here is which of the latter two categories properly described plaintiffs' applications. When they sought review by the Mayor's Agent, plaintiffs invoked the provision governing "New construction", which applies to permits "to construct a building or structure in an historic district or on the site of an historic landmark." D.C.Code § 5–1007 (1994). Defendants argue that plaintiffs were equally entitled to invoke the procedures for "Alterations", D.C.Code § 5–1005, since construction of new townhouses on the landscaped lawn would inevitably "alter" the Cathedral Mansions historic landmark site.[3] Defs.' Reply at 4.

The distinction is more than semantic. Under D.C.Code § 5–1007, the Mayor's

---

**2.** On April 21, 1993, plaintiffs petitioned the District of Columbia Court of Appeals to vacate certain findings made by the Mayor's Agent. Plaintiffs conspicuously failed to challenge the actual denial of the applications or to demand the issuance of permits; accordingly, the Court of Appeals dismissed the complaint on grounds that plaintiffs had not created a justiciable case or controversy. *See District Intown Properties, Ltd. v. District of Columbia Dep't of Consumer and Regulatory Affairs,* 680 A.2d 1373 (D.C.

1996). The Court of Appeals held, however, that findings of the Mayor's Agent concerning economic hardship were made *ultra vires,* thus voiding them of preclusive effect in any subsequent litigation.

**3.** While defendants' motion refers to lots 107–114 as *the site* of the Cathedral Mansions landmark, they were, in fact, designated as *part* of the landmark. *See* Pls.' Mot. for Summ. J. Ex. B–5.

Agent was required to issue plaintiffs' building permits unless he found the proposed construction to be "incompatible" with the character of the landmark. Under D.C.Code § 5–1005, however, the Mayor's Agent could have issued the permits over the objections of the Board if he found the proposed alterations to be "necessary in the public interest," or if failure to issue the permits would result in "unreasonable economic hardship to the owner." The legislative history of the Landmark Act indicates that the "unreasonable economic hardship" test of § 5–1005 was "designed to embody the constitutional standard [for a taking] as defined by the United States Supreme Court." *See* Report of the Committee on Housing and Urban Development, Council of the District of Columbia, on Bill 2–367 (Law 2–144) (October 5, 1978) at 6, 11.[4]

The administrative record in this case reflects considerable confusion among the parties as to whether plaintiffs' project was better described as an "alteration" or "new construction," and as to the applicable standard of review in either case. These issues, however, need not be resolved here. While defendants argue that plaintiffs *could have elected* to characterize their project as an alteration, they do not argue that plaintiffs were *precluded* from characterizing it as "new construction" and proceeding in accordance with § 5–1007. In fact, when the issue was raised by plaintiffs' representative at the first Board hearing in 1989, the Board Chairman stated: "[I]t's our understanding that alterations pertain more to structure as opposed to the land, and so, the application is properly filed under new construction. So it didn't require that you request alteration or even demolition, for that matter." Historic Preservation Board Tr., 7/19/89, at 148–49.

When plaintiffs were informed by defendants of the Board's second "do not issue" recommendation, that notification character-

ized plaintiffs' project as "New [c]onstruction." *See* Defs.' Reply Ex. C. Unsurprisingly, plaintiffs requested review by the Mayor's Agent pursuant to the regulations governing permits for new construction, rather than alteration. *See* Defs.' Reply Ex. B. Although plaintiffs were invited – but ultimately declined – to present evidence of "economic hardship" to the Mayor's Agent, as would have been appropriate in a proceeding under § 5–1005, *see* March 8, 1993 Decision & Order, Pls.' Mot. for Summ. J. Ex. B–1 at 12–13, this did not change the character of the proceeding, which was a review of a permit for new construction pursuant to § 5–1007. *See District Intown Properties, Ltd. v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 680 A.2d 1373 (D.C.1996). Once the Mayor's Agent issued his final order denying their permits, plaintiffs exhausted their administrative remedies under § 5–1007: "A developer who claims that the denial of a permit for new construction constitutes uncompensated taking of his property is free to bring an action against the District for damages, and thus has a readily available legal remedy." *Id.* at 1379.

Finally, even if plaintiffs had elected to proceed under § 5–1005, defendants have failed to demonstrate how that section would provide plaintiffs with a *remedy* for the denial of their building permits. Even if they successfully demonstrated "unreasonable economic hardship," § 5–1005 would merely authorize, but not require, the Mayor's Agent to issue the permits over the objections of the Board. *See* D.C.Code § 5–1005(f) ("No permit shall be issued unless the Mayor finds that such issuance is necessary in the public interest or that a failure to issue a permit will result in unreasonable economic hardship to the owner."). And § 5–1005 provides no mechanism for compensating a property owner if the Mayor's Agent declines to issue an alteration permit despite "unreasonable economic hardship."

---

4. The Council Committee that reported the bill offered no explanation why the "unreasonable economic hardship" test was adopted for purposes of an alteration permit and not for purposes of a new construction permit; however, the report indicates that the test was explicitly developed to conform with the then-recent Supreme Court decision in *Penn Central Transporta-* *tion Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which involved an application for alteration of an historic landmark. *See* Report of the Committee on Housing and Urban Development, Council of the District of Columbia, on Bill 2–367 (Law 2–144) (October 5, 1978) at 6.

For the reasons stated above, the record indicates that plaintiffs have exhausted all available avenues of administrative review, that a final decision has been issued, and that District law does not provide a procedure to compensate plaintiffs for denial of their building permit applications. Their claim that such denial amounts to an unconstitutional taking is thus ripe for review in this forum.

## II.

Plaintiffs, relying on the Supreme Court's decision in *Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), claim that denial of their building permit applications constituted "a total taking" for which they are entitled to compensation. Pls.' Mot. for Summ. J. at 1. Defendants counter that a categorical taking has not been effected, as plaintiffs have "not been denied all beneficial use of [the] property." Defs.' Mot. for Summ. J. at 9. Rejecting the applicability of *Lucas*, defendants seek instead to locate this case within the balancing framework established by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). They argue that, pursuant to the *Penn Central* analysis, no taking has occurred because while plaintiffs have been denied the opportunity to develop the lawn of the Cathedral Mansions property, they continue to derive "economic value" from it. Defs.' Mot. for Summ. J. at 10.

## A.

■ When reviewing a claim that government action has denied "an owner economically viable use of his land," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (citing *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)), a court must determine whether it is to be analyzed through the prism of *Lucas'* categorical standard or *Penn Central'*s balancing inquiry. To do so, the court first has to identify the relevant parcel of property – the "denominator" to be input into the takings calculus – so that it can assess whether the governmental deprivation has been total or

partial. *See, e.g., Lucas*, 505 U.S. 1003, 1016–17 n. 7, 112 S.Ct. 2886, 120 L.Ed.2d 798; *see also Keystone*, 480 U.S. at 497, 107 S.Ct. 1232.

Plaintiffs contend that the relevant parcel consists of Lots 107–114, namely those comprising the lawn of the Cathedral Mansions complex and those for which they filed the permit applications. Pls.' Opp./Reply at 3–5. If they are correct, denial of the permit applications arguably rendered the relevant property "valueless," such that compensation would be required. *Lucas*, 505 U.S. at 1007, 1029, 112 S.Ct. 2886. Defendants, by contrast, argue that the denominator should be defined as "the Cathedral Mansions property as a whole", meaning all of the constituent parts that formed the original Lot 1 that plaintiffs purchased in 1961. Defs.' Mot. for Summ. J. at 10. According to their position, denial of the applications limits the uses to which the lawn can be put, but in so doing does not work an unreasonable diminution in value and thus does not require payment of compensation.

■ Undisputed facts and governing jurisprudential principles establish that defendants' argument must prevail. To begin with, the Supreme Court in *Penn Central* articulated the general rule that " '[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." 438 U.S. at 130, 98 S.Ct. 2646. More specifically, the Court of Claims, experienced in taking matters, has held that in determining what constitutes the relevant parcel,

> [f]actors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus.

*Ciampitti v. United States*, 22 Cl.Ct. 310, 318 (1991); *see also K & K Constr., Inc. v. Department of Natural Resources*, 456 Mich. 570, 575 N.W.2d 531, 537 (1998) (identifying factors of contiguity, unity of ownership, and proposed development scheme).

■ These factors make clear that the appropriate denominator in this case is the entirety of former Lot 1 purchased by plaintiffs in 1961. First, there is contiguity among all the subdivided lots of the formerly unified property. Second, plaintiffs bought all of Lot 1 at one time, and have owned it in its entirety since the date of acquisition. Third, the District of Columbia tax authorities assessed the land, including the site of the building, as a single parcel, with a separate item on the bill for improvements, from 1922 until 1988. Moreover, the Mayor's Agent found, and the D.C. Court of Appeals has related, that the Cathedral Mansions South building was designed and the site landscaped originally and since maintained (at least until 1988) as an integrated whole, with the building enhanced by the lawn "in order to create the illusion of a resort-like building in a park-like setting." *See District Intown Properties v. D.C. Dep't of Consumer and Regulatory Affairs,* 680 A.2d 1373, 1375 (D.C.1996). All of these factors demonstrate that the relevant parcel is a singular lot consisting of the apartment building and the lawn.

■ Supporting this conclusion is the undisputed evidence concerning plaintiffs' "investment-backed expectations." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. This factor, generally considered when a court is assessing whether a taking has occurred, *see id.,* also is important at the parcel definition stage because it sheds considerable light on the landowner's conception of how to identify the relevant property. In the instant case, it is undisputed that plaintiffs bought the entirety of Lot 1 in 1961, and maintained it as a single, unified lot until they sought to subdivide it in 1988. It was only during that period – plaintiffs trace it to "approximately" 1986, Pls.' Stmt. of Undisputed Facts ¶ 5, though no evidence indicates that they made any expenditures before 1988 [5] – that plaintiffs developed an expectation of development and began investing money toward that end. *Id.* While not conclusive in terms of parcel definition, plaintiffs' acknowledgment shows that for approximately one quarter-century – dating back to the point of acquisition – they thought of the Cathedral Mansions property as one unified parcel, not nine discreet lots; for at least twenty-five years, then, they had no investment-backed expectations that the singular parcel would be thought of or treated any other way. This, along with the factors discussed above, supports a finding that the appropriate denominator is the entire parcel formerly known as Lot 1.[6]

**B.**

■ In view of the foregoing, defendant is entitled to a summary judgment that no categorical taking has occurred here. Plaintiffs' property has not been rendered "valueless" by the District's denial of the permit applications, *Lucas,* 505 U.S. at 1007, 112 S.Ct. 2886, and plaintiffs retain "economically viable use of [their] land." *Keystone Bituminous Coal Ass'n,* 480 U.S. at 485, 107 S.Ct. 1232 (citation omitted). Indeed, they retain ownership of and a beneficial interest in an apartment building that produces rental income and that possesses market value; they also own the lawn of the complex, which contributes to the property's environment of "a resort-like building in a park-like setting." *District Intown Properties,* 680 A.2d at 1375.

These circumstances establish that the instant case is materially different from *Lucas.* There the beachfront land had no economically beneficial use to the landowner except as a site for a residence; the denial of a building permit required the landowner to leave the land "substantially in its natural state," which left it "without economic value." 505 U.S. at 1018, 1016 n. 7, 112 S.Ct. 2886. Leaving the land open and undeveloped might have served the public interest in pre-

5. *See* Pls.' Stmt. of Undisputed Facts ¶¶ 4–12. The exhibits supporting Mr. Calomiris' declaration to this effect evidence no such expenditure before 1988. Pls.' Mot. for Summ. J. Ex. A.

6. Plaintiffs concede that there is no authority for defining the relevant parcel based solely on how lots are recorded. Indeed, they admit that parcel definition incorporates factors other than just recorded lots, as they argue that "it is entirely appropriate for [the] Court to treat all of the [r]estricted [l]ots ... as a 'larger parcel'...." Pls.' Opp./Reply at 7. Obviously, if parcels corresponded solely to recorded lots, then plaintiffs' suggestion would be untenable.

serving a fragile beachfront from erosion, but there was no suggestion that preservation would serve any economic interest of the landowner with respect to that parcel or any adjacent or related property. Here, by contrast, original Lot 1 is clearly not "substantially in its natural state." Furthermore, while denial of the construction permits promotes the public interest expressed through the Landmark Act, plaintiffs are able to continue to derive significant economic benefits from their property. The foregoing establishes as a matter of law that denial of plaintiffs' construction permit applications did not effect a categorical taking within the meaning of *Lucas.*

### C.

■■■ This conclusion does not end the inquiry, however. Because denial of plaintiffs' applications arguably effected a partial, yet compensable taking, plaintiffs' claim must now be assessed through the case-specific framework fashioned by the Supreme Court in *Penn Central.* There the Court identified three factors to guide the inquiry: 1) the economic impact of the regulation on the claimant; 2) the regulation's interference with the owner's investment-backed expectations; and 3) the character of the governmental action. 438 U.S. at 124, 98 S.Ct. 2646. These factors are addressed in reverse order.

### 1.

■■ It is well-settled that "[a] taking may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* (citations omitted). As opposed, for example, to a regulation that authorizes a "permanent physical occupation of an owner's property", *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 421, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the denial of plaintiffs' permit applications was nonphysically intrusive, was part of a more general "public program," *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, and was aimed specifically at promoting the congressionally recognized public interest in preserving the open space opposite the National Zoo. *See* D.C.Code § 5–410 (1994); *see also* 438 U.S. at 125, 98 S.Ct. 2646 (finding that regulation sought to promote the "common good" and "the health safety, morals, or general welfare"). By definition, a regulation of this variety is less likely to effect a compensable taking. *See, e.g., Keystone,* 480 U.S. at 485–93, 107 S.Ct. 1232 (finding no taking because of, *inter alia,* the statute's "public purpose").

### 2.

Similarly, denial of the permit applications does not interfere unnecessarily with plaintiffs' investment-backed expectations. As alluded to above, plaintiffs maintained the property as one unified lot for roughly twenty-five years. Plaintiffs acknowledge that only in 1986 – or, as the evidence suggests, 1988 – did they begin to develop expectations of developing Lots 107–114 and begin investing money toward that end. Pls.' Stmt. of Undisputed Facts ¶ 5. The late development of plaintiffs' investment-backed expectations serves to distinguish this case from those in which the Supreme Court has found a taking as a result of interference with investment-backed expectations.

For example, in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court found a taking when a property owner was prevented from mining coal under particular parcels of property. 260 U.S. at 415–16, 43 S.Ct. 158. Critical to the Court's analysis, as later reported in *Penn Central,* was that the claimant had sold the surface rights to the property, but had "expressly reserved the right to remove the coal thereunder," *Penn Central,* 438 U.S. at 127, 98 S.Ct. 2646; the property owner's expectations thus could be traced to the original transaction. Similarly, in *Lucas* the Court underscored that the property owner acquired the two residential lots with the explicit "intention" and expectation of "erect[ing] single-family residences", *Lucas,* 505 U.S. at 1008, 112 S.Ct. 2886; the specific investment-backed expectations that were held to have been frustrated therefore underlay the original transaction.

By contrast, it is undisputed that plaintiffs in this case lacked investment-backed expectations at the time they acquired the property in 1961, and that they did not develop them until shortly before they submitted their permit applications. There is no evidence, nor do plaintiffs claim, that their original purchase of Lot 1 was in any way motivated by expectations concerning development of the lawn. Moreover, there has been no suggestion that the nature of the original transaction was shaped by the existence of any such expectations. Denial of the permit applications therefore did not, under the principles established in *Pennsylvania Coal* and *Lucas,* work a compensable interference with plaintiffs' investment-backed expectations.

The gap between the instant case and *Pennsylvania Coal* and *Lucas* is ostensibly bridged by the common feature that regulatory action taken subsequent to the relevant property transaction frustrated each respective property owner's expectations of development. To the contrary, in *Pennsylvania Coal* and *Lucas* the regulatory action was unforseen, as the respective legislatures enacted regulations that bore on the future use of the newly acquired property. In this case, plaintiffs were on notice that their property was subject to designation as an historic landmark, and to the restricted uses that accompany such designation. Indeed, when, in the 1980s plaintiffs formed their investment-backed expectations, Congress had enacted, and the District government was administering, laws limiting the use of real property near a federal facility such as the National Zoo, *see* Shipstead–Luce Act, D.C.Code § 5–4101 (1994) (effective May 16, 1930), as well as property designated an historical landmark, *see* Historic Landmark and Historic District Protection Act of 1978, D.C.Code § 5–1002. There may be a dispute as to when plaintiffs knew about neighborhood efforts to designate the Cathedral Mansions property as an historic site, but this dispute is immaterial, as plaintiffs clearly recognized the property's distinguished provenance and knew, or should have known, of the pre-existing legal authority to designate it as an historic landmark – authority that ultimately was exercised. In view of the foregoing undisputed facts, no reasonable trier of fact could conclude that denial of plaintiffs' applications to build townhouses frustrated a reasonable expectation that they would be able to do so under well-established law and regulations.

Plaintiffs nonetheless argue that in 1988, before they sought the disputed permits, they subdivided the property into nine lots, and that the District of Columbia authorities zoned the property according to their subdivision proposal. This argument accords excessive import to the subdivision process. Even if plaintiffs had a legitimate expectation that they could subdivide former Lot 1, it does not follow in the circumstances here that they had a legitimate expectation that they could then build on the subdivided lots. Under District of Columbia law, subdivision and construction are subject to two vastly different regulatory processes; pursuant to the latter, public notice must be issued when building permits are submitted, D.C.Code § 5–1007 (1994), while under the former no such notice is required. This stark dichotomy highlights that construction is a matter of heightened public concern. When coupled with the unique location of the Cathedral Mansions complex, and the fact that the *tout ensemble* is a treasured period piece of a famous architect, as a matter of law plaintiffs were not entitled to have a reasonable expectation that their permit applications would be granted. Furthermore, plaintiffs' "bootstrapping" of their own property from one to several lots without interrupting ownership places them in a less favorable posture than that enjoyed by an innocent purchaser of the newly subdivided lots. *See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

3.

The final factor to be considered in the *Penn Central* analysis – the economic impact of the regulation – also supports a finding that no taking has occurred. It is well-settled that when governmental action "does not interfere in any way with the present uses" of the property, and when that action allows the owner "not only to profit

from the [property] but also to obtain a reasonable return on its investment," there is an insufficient economic effect to warrant compensation. *Penn Central*, 438 U.S. at 136, 98 S.Ct. 2646 (citations omitted). Here, denial of the permit applications "does not interfere with what must be regarded as [plaintiffs'] primary expectation concerning the use of the parcel" – as an apartment complex. *Penn Central*, 438 U.S. at 136, 98 S.Ct. 2646. Plaintiffs continue to own and operate the apartment building, and they retain the landscaped lawn that, like the space above Grand Central Terminal, "provid[es] air, light, and views" to the apartments. Pls.' Mot. for Summ. J. Ex. B–1 at 2. Plaintiffs have not argued that the present arrangement does not yield a reasonable return, and they have not alleged disputed facts that such return has been diminished as a result of the denial of their permit applications.

Furthermore, plaintiffs do not dispute that the lawn effects architect Harry Wardman's plan of synergistic value created by the building and the lawn, a plan that the Historic Preservation Board concluded, with reason and without contradiction by plaintiffs, was achieved through a complex "sited imaginatively to provide the greatest possible integration of living space with well-landscaped open space." Pls.' Mot. for Summ. J. Ex. B–5 at 1. More specifically, plaintiffs have not alleged disputed facts to suggest that the lawn, in its present state, contributes no value to the relevant parcel of property. The only allegation they have made is that the lawn has no economic value *when divorced from the rest of the property.* Depos. of Harry A. Horstman, Pls.' Opp./Reply Ex. 1–C at 136. But since it has been established that the proper denominator in the takings calculus is the entirety of former Lot 1, not current Lots 107–114, *see supra* Part II.A., a valuation of a hypothetically detached lawn is irrelevant. Plaintiffs have failed to proffer relevant evidence that the open space makes no significant contribution to the economic value of the complex as a whole. In these circumstances, and particularly in light of the Board's undisputed findings and conclusions, defendants had no responsibility to offer expert testimony to the contrary. Thus, while denial of the permits may prevent plaintiffs from maximizing the value of their property, it does not as a matter of law work such a significant diminution of value as to effect a compensable taking. *See Penn Central*, 438 U.S. at 137, 98 S.Ct. 2646.

The three *Penn Central* factors considered, undisputed facts establish as a matter of law that defendants have not effected a compensable taking. Accordingly, an accompanying Order grants defendants' motion for summary judgment and denies that filed by plaintiffs.

*ORDER*

ORDERED: that Defendant's motion to dimiss should be, and is hereby, DENIED; and it is further

ORDERED: that defendants' motion for summary judgment should be, and is hereby, GRANTED; and it is further

ORDERED: that plaintiffs' motion for summary judgment should be, and is hereby, DENIED.