198 F.3d 874 (D.C. Cir. 1999)
 District In town Properties Limited Partnership, et al.,Appellants
v.
District of Columbia, et al.,Appellees
 No. 98-7209
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 14, 1999
Decided December 17, 1999
 
 [Copyrighted Material Omitted]
 Appeal from the United States District Court for the District of Columbia(No. 96cv00569)
 Wallace A. Christensen argued the cause for appellants. With him on the briefs was Stacey L. McGraw.
 Lutz Alexander Prager, Assistant Deputy Corporation Counsel, argued the cause for appellees. With him on the brief were Jo Anne Robinson, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Melvin W. Bolden, Jr., Counsel.
 John D. Echeverria, Paul W. Edmondson, Elizabeth S. Merritt, and Laura S. Nelson were on the brief for amicus curiae The National Trust for Historic Preservation and D.C. Preservation League.
 Before: Edwards, Chief Judge, Williams and Rogers, Circuit Judges.
 Opinion for the Court filed by Chief Judge Edwards.
 Separate opinion filed by Circuit Judge Williams concurring in the judgment.
 Edwards, Chief Judge:
 
 
 1
 In 1961, District In town Limited Properties Partnership ("District Intown") purchased Cathedral Mansions South, an apartment building and landscaped lawn on Connecticut Avenue across from the National Zoo. District Intown subdivided this property into nine contiguous lots in 1988. In March 1989, all nine lots were declared historic landmarks. In July 1992, the Mayor of the District of Columbia denied District Intown's request for construction permits to build eight townhouses on eight of the nine lots, finding that the construction was incompatible with the property's landmark status. Alleging that the District of Columbia's denial constituted a taking, District Intown and its general partners sued under 42 U.S.C. 1983 (1994) for just compensation under the Takings Clause of the Fifth Amendment.
 
 
 2
 Upon cross motions for summary judgment, the District Court granted summary judgment for the District of Columbia. See District Intown Properties Ltd. Partnership v. District of Columbia, 23 F. Supp. 2d 30 (D.D.C. 1998). The District Court held that the relevant parcel for the purposes of determining whether a taking had occurred consisted of the entire property, including the apartment building, not the eight individual lots that District Intown sought to develop. See id. at 35-36. The court then analyzed the alleged taking under the Supreme Court's holdings in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), and Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978). The District Court found that there was no categorical taking under Lucas, because District Intown had not been deprived of all economic value in the relevant parcel. The trial court further held that District Intown could not make out a claim under Penn Central, because its reasonable investment-backed expectations had not been disappointed and it continued to receive economic benefits from the property.
 
 
 3
 We hold that the District Court correctly found that the relevant parcel for the takings analysis consisted of the entire property held by District Intown, i.e., the property as it was originally purchased in 1961 and as it was held for 27 years prior to the 1988 subdivision. All relevant objective and subjective factors support this conclusion. When the property is viewed as a single parcel, there is no doubt that it has not been rendered valueless. Indeed, even if each subdivided parcel is considered separately, District Intown has not shown a "total taking" under Lucas. In addition, the record here does not show that District Intown's investment-backed expectations were disappointed. This is not surprising, because District Intown could not have had any reasonable investment-backed expectations of development given the background regulatory structure at the time of subdivision. Accordingly, we hold that District Intown did not present any genuine issue of material fact in support of a takings claim under Penn Central or Lucas. We therefore affirm the District Court's judgment.
 
 I. Background
 
 4
 In 1961, District Intown purchased in fee simple Lot 1 of Subdivision Square 2106 on Connecticut Avenue, across from the National Zoo. The property was known as Cathedral Mansions South and consisted of an apartment building and adjacent landscaped lawns. District Intown made no significant changes to the property until 1988, when it subdivided Cathedral Mansions South into nine lots, designated as Lots 106 through 114. The subdivisions were recorded on June 30, 1988. Lot 106 contains the apartment building, and Lots 107 through 114 are each portions of the landscaped lawn. The record indicates that District Intown spent $2,819 to survey the parcel and to record the subdivision. The record does not reflect any other expenses.
 
 
 5
 On December 30, 1988, District Intown applied for permits to build one townhouse on each of the eight landscaped lots. The zoning and structural engineering divisions of the Department of Consumer and Regulatory Affairs approved the permits on March 7, 1989. However, because the property is located across from the National Zoo, the permits were referred to the Commission on Fine Arts. See D.C. Code Ann. 5-410 (1994) ("Ship stead-Luce Act"). The Ship stead Luce Act, in effect since the 1930s, empowers the Commission on Fine Arts to communicate to the Mayor "recommendations, including such changes, if any, as in its judgment are necessary to prevent reasonably avoidable impairment of the public values belonging" to various buildings and parks. Id.On March 31, 1989, the Commission on Fine Arts recommended against construction.
 
 
 6
 Beginning in 1987, before the property was subdivided, a movement developed in the Woodley Park community in support of designating the property a historic landmark. This culminated on March 2, 1989, when the group filed a landmark designation petition. This was five days before District Intown received zoning approval for the construction. The Historic Preservation Review Board ("Review Board") approved the landmark designation on May 17, 1989. Because the landmark designation petition was pending when District Intown's permits were approved for zoning, the permits were referred to the Review Board pursuant to the District of Columbia's landmark laws, see D.C. Code Ann. 5-1001 et seq. (1994 & Supp. 1999), effective since 1979. On July 19, 1989, the Review Board recommended that the construction permits be denied. The permit applications were dismissed without prejudice on December 20, 1991.
 
 
 7
 On January 31, 1992, District Intown filed new permit applications identical in all respects to those previously dismissed. The permits were again referred to the Review Board, which recommended denial because construction on the lawn would be incompatible with its historic landmark status. Pursuant to D.C. Code Ann. 5-1007(e), District Intown requested a hearing before an agent designated by the Mayor. The hearing was held on July 22 and 24, 1992.The Mayor's agent agreed with the Review Board, stating that "any construction destroying the lawn" would be incompatible with its landmark status. Decision and Order of Mayor's Agent p 61 n.1, reprinted in Joint Appendix ("J.A.") 368. In addition, the agent purported to hold that the denial of the construction permits did not work an economic hardship or constitute a taking, but the District of Columbia Court of Appeals has since declared that the agent's holding was outside his jurisdiction. See District Intown Properties, Ltd. v. Department of Consumer and Regulatory Affairs, 680 A.2d 1373, 1379 (D.C. 1996) (decision of the Mayor's agent regarding alleged economic hardship would have no preclusive effect in any future proceeding in which District Intown might claim an uncompensated taking).
 
 
 8
 Thereafter, on March 22, 1996, District Intown filed this 1983 action. On cross motions for summary judgment, the District Court entered summary judgment for the District of Columbia on September 25, 1998. See District Intown Properties Ltd. Partnership, 23 F. Supp. 2d at 39. The court found that the property (i.e., the "relevant parcel") for the purposes of assessing whether a taking had occurred consisted of the original Lot 1 prior to its subdivision into nine lots.See id. at 35-36. Because District Intown continued to receive significant economic benefits from use of the relevant parcel, the court found that appellants failed to demonstrate that their property had been rendered "valueless," and their claim to a taking under Lucas failed. See id. at 36-37. The court then turned to the ad hoc analysis elucidated by Penn Central and found that none of the ad hoc factors support District Intown's takings claim. See id. at 37-39. This appeal followed.
 
 II. Analysis
 A. Standard of Review
 
 9
 This court reviews a grant of summary judgment de novo. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). A party is entitled to summary judgment if the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed R. Civ. P. 56(c). In deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999). Summary judgment may be granted even if the movant has proffered no evidence, so long as the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). As the "party challenging governmental action as an unconstitutional taking," District Intown bears a "substantial burden."Eastern Enterprises v. Apfel, 524 U.S. 498, 523 (1998).
 
 B. The Takings Analysis
 
 10
 The Takings Clause of the Fifth Amendment prohibits the government from taking "private property ... for public use, without just compensation." U.S. Const. amend. V. In a regulatory takings case, the principal focus of inquiry is whether a regulation "reaches a certain magnitude" in depriving an owner of the use of property. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922); see also id. at 415 (asking whether the regulation "goes too far"). The Supreme Court has indicated that most regulatory takings cases should be considered on an ad hoc basis, with three primary factors weighing in the balance: the regulation's economic impact on the claimant, the regulation's interference with the claimant's reasonable investment-backed expectations, and the character of the government action. See Penn Central Transp. Co., 438 U.S. at 124.
 
 
 11
 The meaning of the three factors identified in Penn Central has been amplified by the Court, both in Penn Central and in later cases. The regulation's economic effect upon the claimant may be measured in several different ways. See Hodel v. Irving, 481 U.S. 704, 714 (1987) (looking to the market value of a property); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495-96 (1987) (looking to whether the regulation makes property owner's coal operation "commercially impracticable"); Andrus v. Allard, 444 U.S. 51, 66 (1979) (looking to the possibility of other economic use besides sale, which was prohibited by the challenged regulation); Penn Central Transp. Co., 438 U.S. at 136 (focusing on the ability to earn a reasonable rate of return). A reasonable investment-backed expectation "must be more than a 'unilateral expectation or an abstract need.' " Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). Claimants cannot establish a takings claim "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." Penn Central Transp. Co., 438 U.S. at 130. And the character of the governmental action depends both on whether the government has legitimized a physical occupation of the property, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35 (1982), and whether the regulation has a legitimate public purpose, see Keystone Bituminous Coal Ass'n, 480 U.S. at 485. Finally, under all three of these factors, the effect of the regulation must be measured on the "parcel as a whole." See Penn Central Transp. Co., 438 U.S. at 130-31.
 
 
 12
 The Supreme Court has indicated that it will find a "categorical" or per se taking in two circumstances. The first circumstance includes regulations that result in "permanent physical occupation of property." Loretto, 458 U.S. at 434-35.This circumstance is not at issue in this case. The second circumstance includes regulations pursuant to which the government denies all economically beneficial or productive use of property. See Lucas, 505 U.S. at 1015. This so-called "total taking" claim is at the heart of District Intown's complaint here. Unfortunately, the facial simplicity of the "total taking" standard belies the difficulty in its application. As the Court acknowledged in Lucas, its "rhetorical force ... is greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured." 505 U.S. at 1016 n.7.
 
 
 13
 Under both Lucas and Penn Central, then, we must first define what constitutes the relevant parcel before we can evaluate the regulation's effect on that parcel. In the instant case the question is: Does the relevant parcel consist of the property as a whole or do the eight lots for which construction permits were denied constitute the relevant parcels? This has been referred to as the "denominator problem."E.g., Love ladies Harbor, Inc. v. United States, 28 F.3d 1171, 1179 (Fed. Cir. 1994). State law may offer some guidance on how to define the relevant parcel, but, as the Court has noted, state law is not always determinative. Compare Lucas, 505 U.S. at 1017 n.7 (suggesting that one may look to the influence of the State's property law--whether and to what extent the State has recognized and extended legal recognition to the particular interest alleged to have been deprived of all economic value--on the claimant's reasonable expectations), with Keystone Bituminous Coal Ass'n, 480 U.S. at 500 (refusing to treat the support estate as a separate parcel of property simply because Pennsylvania law recognizes it as such and noting that "our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights").
 
 C. The Relevant Parcel
 
 14
 The definition of the relevant parcel profoundly influences the outcome of a takings analysis. Above all, the parcel should be functionally coherent. In other words, more should unite the property than common ownership by the claimant. Thus, a court must also consider how both the property owner and the government treat (and have treated) the property.
 
 
 15
 The District Court used several factors to determine the relevant parcel: the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, and the extent to which the restricted lots benefit the unregulated lot. See District Intown, 23 F. Supp. 2d at 35 (citing Ciampitti v. United States, 22 Cl. Ct. 310, 318 (1991)). An analysis focused on these factors is eminently sound and it mirrors the approach taken by other courts in regulatory takings cases. See Forest Properties, Inc. v. United States, 177 F.3d 1360, 1365 (Fed. Cir.) (stressing the owner's treatment of property as a unit from the time of purchase), cert. denied sub nom. RCK Properties v. United States, 120 S. Ct. 373 (1999); K & K Constr. Co. v. Department of Natural Resources, 575 N.W.2d 531, 537 (Mich.) (stressing contiguity, unity of ownership, and a common development plan), cert. denied, 119 S. Ct. 60 (1998).
 
 
 16
 Applying these factors, the District Court correctly determined that all nine lots should be treated as one parcel for the purpose of the court's takings analysis. The lots are spatially and functionally contiguous. District Intown purchased the property as a whole in 1961 and treated it as a single indivisible property for more than 25 years. District Intown presented no evidence that, even after subdivision, it treated the lawn lots separately from Lot 106, the lot that contains the apartment building, for the purposes of accounting or management. The intentional act of subdivision is the only evidence produced by District Intown that it has treated the lots as distinct units. In fact, before the Mayor's agent, District Intown did not come forward with evidence showing that it had, for accounting purposes, treated the lawn maintenance fees separately from expenses associated with maintaining the apartment building. See Decision & Order of Mayor's Agent p 40, reprinted in J.A. 364. While there is a dispute as to whether the adjacent landscaped lawn increases the apartment building's value, this is immaterial. Even if Lot 106 were deemed to have the same value with or without Lots 107 through 114, the application of the other three factors strongly suggests that Lots 106 through 114 are functionally part of the same property.
 
 
 17
 Appellants argue that the District Court was wrong to treat all the lots as a single parcel because it contradicts Lucas and two Federal Circuit cases. This argument falls flat. District Intown first argues that the Lucas Court termed "extreme" and "unsupportable" a similar decision by the state court in Penn Central to treat multiple holdings as a single parcel for takings analysis. See Brief for Appellants at 15-16. This dictum, see Lucas, 505 U.S. at 1017 n.7, referred, however, only to the state court's decision to treat all of Penn Central's holdings in the vicinity of Grand Central Station as part of the denominator for the purposes of deciding whether plaintiffs could receive a reasonable return on their investment in Grand Central. See Penn Central Transp. Co. v. New York, 366 N.E.2d 1271, 1278 (N.Y. 1977). The Penn Central Court had no need to address this holding. The Lucas dictum casts aspersions on the state court's elevation of one factor, unity of ownership, over other factors in determining the relevant parcel. The District Court engaged in no such "extreme" conduct here; it did not look to all of District Intown's holdings in the vicinity of Cathedral Mansions South to evaluate the economic effect of the regulation at issue here; it looked to contiguous property that was purchased and treated as a single unit by appellants.
 
 
 18
 Similarly, the two Federal Circuit cases cited by District Intown do not undermine the District Court's definition of the relevant parcel. See Brief for Appellants at 16 (citing Loveladies Harbor, 28 F.3d at 1171 and Florida Rock Indus., Inc. v. United States, 791 F.2d 893 (Fed. Cir. 1986)). Neither of these cases support appellants' position and, in fact, Loveladies Harbor supports the District Court's decision. In Florida Rock Industries, the court reviewed the Army Corps of Engineers' uncompensated rejection of the plaintiff's application to mine limestone on 98 acres of the plaintiff's wetland property. See Florida Rock Indus., 791 F.2d at 896. The Federal Circuit affirmed the trial court's decision to consider the 98 acres as the relevant parcel separate from the adjacent 1,462 acres of wetland. See id. at 904. The Federal Circuit's justification for this decision, however, was that all the evidence and the findings indicated that the Army Corps of Engineers would have rejected mining on all of the property, so there was no point to including all 1,560 acres in the relevant parcel. See id. at 904-05. Thus, Florida Rock Industries is not analogous to the instant case; there is no indication that the District of Columbia will prevent District Intown from continuing to use its property to obtain income from its apartment building.
 
 
 19
 Loveladies Harbor lends support to the District Court's decision to treat Lots 106-114 as one parcel. The plaintiff in Loveladies Harbor sought to develop a total of 12.5 acres of land, consisting of 11.5 acres of wetlands and one acre of filled upland. See Loveladies Harbor, 28 F.3d at 1180. The Army Corps of Engineers refused to grant the permit required to fill the wetlands acreage. See id. at 1174. In reviewing whether this denial constituted a taking the Federal Circuit found that the trial court correctly concluded that the relevant parcel was the entire 12.5 acres, not just the 11.5 acres to which the permit denial applied. See id. at 1181. Thus, Loveladies Harbor argues against treating the property burdened by the regulation separately from contiguous property.
 
 
 20
 Moreover, the Loveladies Harbor Court emphasized that a "flexible approach, designed to account for factual nuances," guides its analysis of the denominator problem. Id. These factual nuances include "whether there remained substantial economically viable uses for plaintiff's property after the regulatory imposition," id. (citing Deltona Corp. v. United States, 657 F.2d 1184 (Ct. Cl. 1981)), and "the timing of transfers in light of the developing regulatory environment."Id. Both of these factors support our conclusion in the instant case that Cathedral Mansions South as a whole constitutes the relevant parcel.
 
 
 21
 Finally, Penn Central is instructive where, as here, appellants own a single piece of property that is divisible into several legally recognized entities. Indeed, the Court was rather blunt in saying that
 
 
 22
 "[t]aking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abro-gated.
 
 
 23
 Penn Central Transp. Co., 438 U.S. at 130. The Court also made it clear that a party may not "establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest they heretofore had believed was available for development." Id. The Court found this suggestion to be "simply untenable." Id.
 
 
 24
 On the basis of the foregoing authority, it seems clear here that we must analyze District Intown's property not as separate, potentially divisible and transferable parcels, but as one contiguous parcel. Appellants note that the District of Columbia has taxed Lots 107 through 114 at a higher rate since subdivision, reflecting the District of Columbia's assessment that these lots are vacant develop able land. They contend that it is inconsistent for the District of Columbia to speak from both sides of its mouth in this regard, claiming for tax purposes that the lots are develop able, but refusing to permit development on the lots. We simply note that appellants retain the right to recombine the parcels and treat them as one property for the purposes of taxation, so no further disadvantage will befall them on this score.
 
 
 25
 We are perplexed by our concurring colleague's criticism of our approach to evaluating a takings claim. As the concurring opinion correctly notes, at bottom, the approach that we follow and the result that we reach are in accord with Supreme Court case law. Unless and until the Court instructs otherwise, we are obliged to judge within the bounds of established precedent.
 
 D. Analysis Under Lucas
 
 26
 Given that Lots 106 through 114 should be treated as a single parcel, the District Court's denial of summary judgment on District Intown's Lucas claim is unremarkable. To come within Lucas, a claimant must show that its property is rendered "valueless" by a regulation. Lucas, 505 U.S. at 1009. District Intown presented no evidence to show that the regulation deprived the property as a whole of all economically beneficial use.
 
 
 27
 Even were we to view Lot 106 as distinct from Lots 107 through 114, it seems plain that the District Court should have granted appellees' motion for summary judgment. Drawing all inferences in favor of District Intown, the record does not support the conclusion that Lots 107 through 114 are rendered "valueless" by the regulation at issue. The record contains a finding by the Mayor's agent that any construction that destroyed the lawn would be incompatible with the lawn's status as a historic landmark. See Decision & Order of Mayor's Agent p 61 n.1, reprinted in J.A. 368. District Intown argues from this that its case fell on all fours within Lucas. District Intown seeks to extend Lucas beyond its reach. The Lucas Court consciously recognized that it was drawing an arbitrary line between total destruction of economic value and something marginally less than total destruction. See 505 U.S. at 1019 n.8 (pointing out that while the line establishing a categorical deprivation as requiring a complete diminution in value is arbitrary as it relates to someone who only suffers a 95% deprivation in value, the person whose deprivation is "one step short of complete" may still seek compensation under the Penn Central balancing test). District Intown propounded no evidence that the lawns' economic value was totally destroyed as is required by Lucas, nor did District Intown offer evidence of the plots' fair market value after its construction permits were denied. Cf. Florida Rock Indus., 791 F.2d at 905 (reversing the trial court's finding that denial of permit constituted an uncompensated taking because the court failed to consider the property's fair market value after regulation).
 
 
 28
 The concurring opinion misconstrues the opinion for the court when it suggests that, pursuant to our analysis, no compensable taking could ever be found. As noted in the foregoing discussion, we simply intend to highlight the limited nature of the Lucas inquiry, and note that there would be no "categorical" taking even were we to view the parcels as separate under Lucas. We do not pass on how the parcels would fare separately under Penn Central's ad hoc analysis.
 
 E. Analysis under Penn Central
 
 29
 There are three main factors to be considered in Penn Central's ad hoc inquiry: the character of the government action, the regulation's economic effect on the claimant, and the effect on investment-backed expectations. District In-town does not appear to argue that the character of the governmental action counsels finding a taking; this is not a permanent invasion, but rather a general regulation with a legitimate public purpose. As to the economic effects, District In-town offered no evidence that this regulation rendered Lots 106-114 unprofitable to maintain; there is nothing in the record to suggest that the apartment building does not bring in a sufficient return for District In-town, and a claimant must put forth striking evidence of economic effects to prevail even under the ad hoc inquiry. See Penn Central Transp. Co., 438 U.S. at 131 (reviewing the Court's decisions upholding regulations despite diminution in a property's value of more than 75%).
 
 
 30
 Finally, District In-town did not present sufficient evidence that it had a reasonable investment-backed expectation to develop the lawns into apartment buildings. Here, as in Penn Central, the regulation does not interfere with District In-town's "primary expectation" concerning the use of the parcel, because it "not only permits but contemplates that appellants may continue to use the property precisely as it has been used" for the past 28 years. Penn Central Transp. Co., 438 U.S. at 136.
 
 
 31
 District Intown suggested at oral argument that it has satisfied the requirement of demonstrating reasonable investment-backed expectations because it purchased property that, at the time of purchase, was subdividable. This is not sufficient to establish the existence of reasonable investmentbacked expectations. In this case, where the development District Intown proposes departs from the property's traditional use, and the moment of purchase is so attenuated from the moment of subdivision, the claimant surely must point to some action beyond mere purchase to establish the reasonableness of its expectations.
 
 
 32
 Appellants also argue that their expectations of the property's use between the moment of purchase and the moment of subdivision could have reasonably changed. This may be, but when appellants subdivided they surely knew that the legal regime had changed since they first bought their property. Moreover, they knew that any subdivided parcel would be subject to that regime. Lucas teaches that a buyer's reasonable expectations must be put in the context of the underlying regulatory regime. See 505 U.S. at 1030 (stating that the Takings Clause does not require compensation when the restriction is proscribed by background state law rules or understandings). District Intown purchased and subdivided its property subject to an existing regulatory regime that establishes that District Intown could have had no reasonable expectations of development at the time it made its investments.
 
 
 33
 At the time of purchase, District Intown could have reasonably expected the Ship stead-Luce Act to affect its rights of development. For approximately 60 years, the Ship stead Luce Act has restricted development on properties that, like Cathedral Mansions South, abut or border upon the National Zoo. See D.C. Code Ann. 5-410. Were that not sufficient, after 1979, D.C.'s historic landmark laws additionally limited expectations of development. See id. 5-1001 et seq. Thus, at the time District Intown subdivided the property, it knew, or should have known, that the property was potentially subject to regulation under the landmark laws. Cf. Amicus Curiae Brief at 15 (pointing out that almost the entire length of Connecticut Avenue from M Street to almost a mile north of District Intown's property is either landmarked or within a historic district). Businesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends. See Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 645 (1993). In this case, District Intown was in the real estate business, with a history of restriction of development for the purpose of preserving historic sites. Similarly, the Supreme Court rejected a company's claim of reasonable expectations that the Environmental Protection Agency would maintain trade secret confidentiality where the industry had long "been the focus of great public concern and significant government regulation" and the "possibility was substantial that the Federal Government ... would find disclosure [of trade secrets] to be in the public interest." Monsanto Co., 467 U.S. at 1008-09. Prior to and after subdivision, this particular property was the subject of increasing public activity devoted to restricting development through landmark designation. See Good v. United States, 189 F.3d 1355, 1361-63 (Fed. Cir. 1999) (finding the claimant had no reasonable expectations where he purchased the land subject to environmental regulation and watched as public concern for the environment increased and the applicable regulations became more stringent before seeking approval for development).
 
 
 34
 District Intown also argues that the District Court's finding that the regulation did not have a significant economic impact was erroneous. District Intown bases this argument on the assertion that they presented undisputed evidence that the lawns, absent development, add nothing to the value of the apartment building. See Brief for Appellants at 24-25. This argument misunderstands the substantial burden District Intown faced in District Court. District Intown had to produce evidence showing that its entire property, including Lot 106, no longer provided a reasonable rate of return given the D.C. regulation. Whether the lawns add value to the apartment building is irrelevant to whether the property as a whole can be operated at a sufficient profit even with the regulation. In short, none of the Penn Central factors support District Intown's claim of a compensable deprivation of property.
 
 III. Conclusion
 
 35
 For the reasons stated above, we affirm the District Court's grant of summary judgment in favor of the District of Columbia.
 
 
 36
 So ordered.
 
 
 37
 Williams, Circuit Judge, concurring in the judgment:
 
 
 38
 The District of Columbia's Historic Preservation Board imposed historic landmark status not only on an apartment building named Cathedral Mansions South but also on a substantial stretch of adjacent lawn bordering the sidewalks of Connecticut Avenue. District Intown, the owner of both, claims that as applied to the lawn the landmarking effects a taking of its property in violation of the Takings Clause of the Fifth Amendment. The majority's disposition is--with one important exception--in general accord with the current opinions of the Supreme Court. Those decisions are of course binding. At the same time, however, it is not inappropriate to identify ways in which the prevailing analysis elevates formal concepts over economic reality and tends to strip the Clause of its potential for fulfilling the framers' likely purposes.
 
 
 39
 The economist's justification for the Takings Clause is that it provides a check on government's likely tendency to waste resources by treating private property as a free good. See Richard A. Posner, Economic Analysis of Law 58 (4th ed. 1992) ("The simplest economic explanation for the requirement of just compensation is that it prevents the government from overusing the taking power."). This is just an application of the general principle that if a firm can externalize costs (e.g., the health costs of polluting the air), it will use more of the unpriced resource (in this example, air as a waste sink) than it would if required to pay. And it will tend to overproduce the goods or services whose production uses the superficially "free" good--i.e., it will produce them at a level where the true value of the extra inputs exceeds the true value of the extra output. See generally Robert Cooter & Thomas Ulen, Law and Economics 45-46 (1988). As applied to government regulation, similar oversupply can be expected--here, production of regulations that impose more costs than they afford benefits, that do more harm than good.
 
 
 40
 The framers, though not articulating the purpose of the Clause in economic terms, evidently did view it as aimed at correcting the incentives of the political branches. There is evidence, for example, that James Madison saw electoral power slipping into the hands of a non-landholding majority, which in a "leveling" mode could be expected to invade landowners' rights. See William Michael Treanor, The Original Understanding of the Takings Clause and the Political Process, 95 Colum. L. Rev. 782, 849 (1995). Late twentieth century America, of course, displays a far greater range of purposes than "leveling" for reallocation of rights. While the resulting proposals are naturally advanced in the name of the public good, many are surely driven by interest-group purposes, commonly known as "rent-seeking." Among these proposals, at least some inflict aggregate costs considerably outweighing their aggregate benefits, paralleling the wasteful production associated with private firms' externalization of costs. The Takings Clause serves to curb such inefficiencies.See, e.g., Richard A. Epstein, Takings: Private Property and the Power of Eminent Domain 281 (1985) ("[T]he Takings Clause is designed to control rent seeking and political faction. It is those practices, and only those practices, that it reaches.").
 
 
 41
 A Takings Clause construction that was dedicated without qualification to preventing such government externalization would require compensation whenever regulation reduced the value of anyone's property, however slightly. Balanced against that goal is an array of considerations. Most obvious is the cost of calculating and administering compensation, which would tend to sink many a beneficent statute. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1018 (1992) (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922)). (The compensation cost itself would be only a weak countervailing factor, for most beneficent regulation would presumably generate gains large enough to pay the losers if identification and calculation were costless.) My goal here is not to pinpoint the appropriate balance between these competing considerations, much less to suggest that the correct reading is one under which all regulation materially adversely affecting a property's value would be compensable. Rather, it is simply to note the ways in which modern interpretation of the Takings Clause, as exemplified in today's decision, impairs its role as a disincentive to wasteful government activities.
 
 
 42
 * * *
 
 
 43
 The majority applies an apparent presumption that contiguous parcels under common ownership should be treated as one parcel for purposes of the takings analysis. This presumption tends to reduce the likelihood that courts will order compensation. The larger the parcel, the greater the chance that the regulated land will retain an economically viable use.Where no such use remains, there is a "total taking" and the government can "resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with," Lucas, 505 U.S. at 1027; where an economically viable use survives regulation, the best the owner can hope for is "partial" takings analysis. Under the latter courts will determine whether to award compensation by looking to "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action," Kaiser Aetna v. United States, 444 U.S. 164, 175 (1979); see also Eastern Enters. v. Apfel, 118 S. Ct. 2131, 2146 (1998); Lucas, 505 U.S. at 1019 n.8, and will generally deny compensation so long as the restriction "substantially advance[s] legitimate state interests," Agins v. City of Tiburon, 447 U.S. 255, 260 (1980); see also Dolan v. City of Tigard, 512 U.S. 374, 385 (1994). Few regulations will flunk this nearly vacuous test. In fact, the Supreme Court has only once found a partial taking to be compensable, and even then only a plurality applied the partial takings analysis. See Eastern Enters., 118 S. Ct. at 2149; see also id. at 2154-60 (Kennedy, J.) (rejecting the plurality's takings analysis and finding invalidity on other grounds).
 
 
 44
 The Supreme Court has offered several justifications for this distinction between partial and total takings. See, e.g., Lucas, 505 U.S. at 1017-18 (suggesting that "from the landowner's perspective," a total taking is tantamount to a physical taking, and that from the government's perspective the concern that an obligation to compensate for any incidental value diminution would impede effective functioning cannot apply in the "relatively rare situations" of total takings). From the perspective of ensuring that the government not engage in wasteful behavior, however, the focus on the uses of the land that remain is misplaced: "[W]hat is decisive is that which is taken, not that which is retained." Epstein, Takings, supra, at 58. Whether the landowner is left with a limited use of the land or none at all is hardly relevant to that issue. And as the regulating government delineates the scope of regulation, the opportunity for strategic behavior is obvious.
 
 
 45
 The majority's cursory application of the Penn Central factors further broadens the gap between the two modes of analysis, reinforcing the seemingly predetermined conclusion: in partial takings cases, the government wins. The majority states that District Intown has not shown the land "unprofitable to maintain," Maj. Op. at 14; it is unimaginable, however, absent an extraordinary tax liability, that a parcel could retain an economically viable use yet have a net negative value. The majority goes on to say that District Intown has failed to show that the land does not "bring in a sufficient return," id., but does not answer the all-important question: a return on what? on out-of-pocket costs? on initial purchase price? on fair market value? Moreover, the majority provides no guidance as to how "sufficient" the return must be, except to cite Penn Central, in which the Court found that a 75% diminution in value did not constitute a compensable taking. See id.
 
 
 46
 Similarly, in its consideration of District Intown's "reasonable investment-backed expectations," the majority's analysis begs the question whether any landowner, in a world where zoning regulations are prevalent, could ever argue that a particular regulation was "unexpected." The presumption is insurmountable: "Businesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative needs." Maj. Op. at 15. Although the 1931 Ship stead-Luce Act might have put District Intown on notice that some regulation of architectural design might be expected, it is farfetched to conclude that District Intown, merely because of its proximity to the zoo, should reasonably have anticipated an absolute ban on construction; the city's counsel, under questioning at oral argument, failed to identify any uses, or even attempted uses, of the Shipstead-Luce Act to support a complete construction veto. Although the Takings Clause is meant to curb inefficient takings, such a notion of "reasonable investment-backed expectations" strips it of any constraining sense: except for a regulation of almost unimaginable abruptness, all regulation will build on prior regulation and hence be said to defeat any expectations. Thus regulation begets regulation.
 
 
 47
 Although the presumption in favor of looking at the parcel as a whole, and in turn the increased reliance on the partial takings mode of analysis, is at odds with the underlying principle of the Takings Clause, it is perhaps the best construction of the Supreme Court's limited guidance. The Court has never squarely addressed the question of how courts should define the relevant geographic parcel of land, also known as "horizontal severance." Marc R. Lisker, Regulatory Takings and the Denominator Problem, 27 Rutgers L.J. 663, 705 (1996). In Nectow v. City of Cambridge, 277 U.S. 183 (1928), the Court considered whether the city council had effectuated a taking of plaintiff's land by zoning as "residential" a 100-foot strip on plaintiff's 140,000 square foot parcel. Although the Court appeared to treat the relevant parcel as encompassing only the fractional strip, this was in no respect relevant to the Court's decision. In Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978), the Court applied a very weak form of horizontal severance, focusing exclusively on the landmarked building itself without treating the owner's neighboring--but not adjacent--property as part of the greater parcel, as had the New York Court of Appeals. See Penn Central Transportation Co. v. New York City, 366 N.E.2d 1271, 1276-77 (N.Y. 1977). But Penn Central tells little, as the properties were not all contiguous, had been put to different uses, and had never been treated as a unified whole by the owners or the City.
 
 
 48
 Penn Central's handling of "vertical severance," however, is informative, if only by analogy. Using language seemingly broad enough to encompass horizontal severance, the Court made clear that it would not consider the air rights above Grand Central separately from the land rights: " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." Penn Central, 438 U.S. at 130; see also Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 496-502 (1987) (refusing to regard either coal that statute required miners to leave in place (about 2% of total coal), or the "support estate," as distinct property for ascertaining whether statute denied owners all economically viable uses).
 
 
 49
 The Court has expressed similar reluctance to engage in "conceptual severance" more generally (i.e., the treatment of any specific property right as a single unit). In Andrus v. Allard, 444 U.S. 51 (1979), the Court refused to treat extinction of the right to sell any part of a lawfully killed bald eagle as a total taking. See id. at 65-66 ("At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."). The Court arguably evidenced a retreat from this strong position in Hodel v. Irving, 481 U.S. 704, 717-18 (1987), in which it found a taking in legislation that "completely abolished" certain landowners' rights to dispose of their property by descent or devise, even though they retained complete rights to possess and to make inter vivos transfers. The Court has not, however, reached agreement on the scope of this retreat.Compare id. at 719 (Scalia, J., concurring) (saying the decision "effectively limits Allard to its facts"), with id. at 718 (Brennan, J., concurring) (saying that the case was "unusual" and thus had no impact on Allard). Overall, I think the majority is correct in its implicit understanding that the Supreme Court is reluctant to carve a landowner's parcel into smaller units for which compensation might be more likely.
 
 
 50
 But the factors that the majority applies in making the decision, drawn from decisions of the Federal Circuit and Claims Court and characterized by the majority as "eminently sound," Maj. Op. at 9, strike me as uninformative and largely irrelevant. The factors considered are: (1) whether the neighboring parcels are contiguous, (2) whether they were acquired simultaneously, (3) whether they have been treated as a single unit, and (4) the extent to which the restricted lot benefits the neighboring lot. Maj. Op. at 8-9.
 
 
 51
 The first factor, contiguity, is clearly necessary but in no way sufficient. The next two factors--simultaneity of acquisition and unity of use--are more troublesome. Both elevate history--either the historical purchase or the historical use-over the real-world present relationship between the tracts. Compare Laura M. Schleich, Takings: The Fifth Amendment, Government Regulation, and the Problem of the Relevant Parcel, 8 J. Land Use & Envtl. L. 381 (1993) (proposing that courts look to the "moment of regulation" when defining the relevant parcel). The majority's focus on the property's use prior to regulation tells us nothing about the value producing opportunities foreclosed at the time of regulation."It is, of course, irrelevant that [the government] interfered with or destroyed property rights that [plaintiff] had not yet physically used. The Fifth Amendment must be applied with 'reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future.' " Penn Central, 438 U.S. at 143 n.6 (Rehnquist, J., dissenting, quoting Boom v. Patterson, 98 U.S. 403, 408 (1879)).
 
 
 52
 The majority mentions but brushes aside a fourth factor-the extent to which the regulated parcel benefits the neighboring lot. Maj. Op. at 9. Yet this appears the most relevant. The more a burdened tract in its regulated use benefits contiguous property, the less likely that the regulation has a net negative impact. In the extreme case a property interest may be worthless except in conjunction with another. Thus in Keystone Bituminous Coal Ass'n, the Court pointed out that the "support estate" had "value only insofar as it protects or enhances the value of the estate with which it is associated [i.e, the mineral estate]," 480 U.S. at 501, and therefore refused to treat the "support estate" as a separate interest at all. Similarly, small parcels of land, either in the interior or around the edges of greater parcels, commonly are valuable only when they combine with the greater parcel to create a more valuable whole; for regulation of the exterior (such as setback requirements), then, it makes sense to measure the impact in conjunction with the "primary" parcel. Looking to the property owner's benefit from these internal synergies parallels use of "average reciprocity of advantage," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922), which considers the benefit that each burdened owner--as in ordinary zoning or historic districting-receives from the similar restriction of his neighbors.
 
 
 53
 Of course there will be some synergy between almost any two neighboring parcels under common ownership, since unified ownership creates options for the sole owner that multiple landowners could achieve only by contracting. But synergy is a matter of degree, and mere contiguity should not be enough. One commentator proposes a rather demanding synergy test, arguing that the regulated tract should be considered as its own parcel so long as not all of its value derives from synergies with neighboring land; in such cases, the parcel would have an independent economically viable use, which if destroyed by regulation would be compensable under Lucas. See John E. Fee, Comment, Unearthing the Denominator in Regulatory Taking Claims, 61 U. Chi. L. Rev. 1535, 1557-58 (1994). One need not go so far to see the skimpiness of the synergy here.
 
 
 54
 To be sure, Cathedral Mansions is more than several contiguous parcels. According to the decision of the Historic Preservation Review Board, "The buildings are sited imaginatively to provide the greatest possible integration of living space with well-landscaped open space." Joint Appendix ("J.A.") 320. (Passers by who observe the rather bare lawn will have to reach their own judgments on the adjective "welll and scaped.") Integration there doubtless is--almost any lawn around a building will manifest a degree of integration. But there is no explicit showing that these synergies depend on the entire lawn remaining undeveloped. The proposed townhouses would cover only the portion of the lawn abutting Connecticut Avenue, still leaving the interior portion, approximately half the lawn, undeveloped. Common sense would suggest that at some distance from the building marginal synergies created by extra lawn space become slight, and thus that the part of the lawn beyond that line should be treated as its own parcel for takings purposes. Further, although District rent-control law evidently allows the owner to earn a return on the tax-assessed value of land in a single tract with a rent-controlled building (here the owner could apparently recover that status by undoing the formalities of subdivision), that value is likely to be only a tiny fraction of the value absent the historic landmarking.
 
 
 55
 In fact, it may well be completely different synergies--ones between the lawn and adjacent Connecticut Avenue--that have driven the landmarking decision. The Board observed that the lawn "contributes significantly to the unique open space character of Connecticut Avenue." J.A. 320. A cynic might suspect that the alleged relationship between the lawn and the Cathedral Mansions apartments is little more than a cloak by which the citizens of Upper Northwest Washington have secured some parkland on the cheap. Parks are good, but the Fifth Amendment says that taking them is not.
 
 
 56
 Of course, there is another synergy between the two parcels and adjacent Connecticut Avenue, namely the historical value that inheres in the preservation of a building as it was initially constructed (i.e., with an expansive lawn beside it).Uncompensated landmark preservation seems to rest on this synergy. The Court in Penn Central embraced the view that "the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole." 438 U.S. at 134. This broad language seems to redefine "reciprocity of advantage" in such a way that no government act could ever require compensation, as the afflicted owner would be a member of the taking polity and thus in receipt of offsetting advantages, artificially presumed to be adequate.
 
 
 57
 Apart from obliterating takings law, such a view has peculiarly perverse effects in the realm of historic preservation. Although such laws try to preserve for society the positive externalities created by buildings like Cathedral Mansions, inflicting the entire cost on the creator of the landmark (or his successor in interest) is bound to discourage investment in first-class design. Moreover, while insurance markets can achieve the risk-spreading (or anti-"demoralization") goals that some attribute to the Takings Clause, compare Posner, Economic Analysis of Law, supra, at 58, they cannot offset non-compensation's disincentive to good design. Historic landmark preservation, after all, is imposed selectively on those who went out of their way to secure architectural distinction. The higher the quality, the higher the premium for takings insurance; the disincentive is inescapable.
 
 
 58
 Having found that the lawn and apartment parcels should be treated as a unit, the majority nevertheless considers whether compensation would be due even if the lawn were analyzed separately; in doing so, it gratuitously takes an even harsher stance against compensation than does present law. The majority finds that District Intown has failed to offer evidence that the regulation denies it "economically viable use of [the] land," Lucas, 505 U.S. at 1016, even though the Mayor's own agent found that "any construction that destroyed the lawn would be incompatible with the lawn's status as an historic landmark." Maj. Op. at 13. Thus, so long as the lawn is untouched, "economically viable" uses are permissible. It is hard to imagine what "economically viable" use that constraint leaves, unless the majority means that the very barest thread of value, yielded by some thoroughly bucolic use, is enough to defeat a total takings claim. By this standard, no regulation can ever effect a total taking, and at best will be tested only under the far weaker partial takings rubric.
 
 
 59
 * * *
 
 
 60
 The prevailing Federal Circuit-Claims Court method of defining the relevant parcel, followed by the panel here, focuses on marginal issues and largely overlooks the more critical concern of synergies; the focus on the landowner's historical, rather than proposed, use further skews the analysis. But the Supreme Court's general approach seems to militate in favor of looking to the parcel as a whole. Similarly, although resting uncompensated landmark preservation on the idea of reciprocal advantage stretches the concept into meaninglessness, and the denial of compensation discourages ex ante what it hopes to foster ex post, the current cases give these arguments little purchase. Accordingly, I concur in the majority's decision to affirm.