Stegall, J., concurring:
The corporate practice of medicine doctrine is a judicial innovation. The doctrine "was based on a judicial interpretation, which had not been expressly overturned by legislation, rather than on any statutory provision(s)." St. Francis Regional Med. Center, Inc. v. Weiss , 254 Kan. 728, 736, 869 P.2d 606 (1994). This "judicial interpretation" arose from the belief that "to permit a corporation to practice a licensed profession would be injurious to the public welfare" and from a desire to "protect the public health." 254 Kan. at 745-46, 869 P.2d 606.
Infirm from the start, the doctrine amounts to an injection of judicial lawmaking into a realm of public policy traditionally reserved to the Legislature. See In re Gunn, Petitioner , 50 Kan. 155, 223, 32 P. 948 (1893) (Allen, J., dissenting) ("Generally speaking, the courts have nothing to do with matters of policy, or with the determination of questions as to the expression of the popular will."). More perniciously, the doctrine is a species of rent-seeking, coopting this court and its power to make common law in favor of a private interest group (in this case organized medical professionals) in order to provide shelter from economic competition-all under the guise of public safety and welfare. See District Intown Properties v. District of Columbia , 198 F.3d 874, 885 (D.C. Cir. 1999) (Williams, J., concurring) ("While the resulting proposals are naturally advanced in the name of the public good, many are surely driven by interest-group purposes, commonly known as 'rent-seeking.' "). Finally, economic and legal changes in the century since the adoption of the doctrine have both highlighted its inefficiencies and undermined its effectiveness. For these reasons, in the appropriate case, we ought to reconsider and discard the doctrine altogether.
BACKGROUND
In Winslow v. Board of Dental Examiners , 115 Kan. 450, 223 P. 308 (1924), we first held a corporation could not practice dentistry through the employment of a licensed dentist because: "Corporations may not be graduated from dental colleges, they have neither learning nor skill, and they may not be examined, registered, nor licensed as dentists. Therefore the legislature does not permit the organization of a domestic corporation to practice dentistry." 115 Kan. at 452, 223 P. 308. In so holding, we said a "personal"-as opposed to corporate-practice of dentistry was necessary "to protect the public from ignorance, unskillfulness, unscrupulousness, deception, and fraud." 115 Kan. at 451-52, 223 P. 308. We even declared the corporate practice of dentistry was "gravely reprehensible from the standpoint of morality." 115 Kan. at 452, 223 P. 308. Thus, without any textual command, we "inferred a legislative intent to establish a corporate practice of medicine ban based upon these public policy grounds." Comment, The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine: Injecting a Dose of Efficiency into the Modern Health Care Environment , 47 Emory L.J. 697, 706 (1998).
Arguably the judicial inference of legislative intent drawn by the Winslow court arose as a judicial gloss on a statutory scheme that did not give medical licenses to corporations. A cursory examination, however, demonstrates that the rule cannot be justified as any species of statutory interpretation. Indeed, in what sense would a corporation employing a dentist be practicing dentistry? The dentist is the license holder and the practitioner. The manner in which the dentist chooses to organize his or her business affairs is entirely untouched by the licensure scheme. Much later, in St. Francis , we obliquely acknowledged the common law grounding of our corporate practice of medicine *1269 doctrine when we noted that the rule was not "based ... on any statutory provision." 254 Kan. at 736, 869 P.2d 606. Instead, this common law rule was anchored half-heartedly in the statutory scheme with a dubious logical leap that "equated a corporation's employing a licensed professional individual who practiced dentistry or optometry with a corporation's practicing that profession." 254 Kan. at 735, 869 P.2d 606.
Other courts adopting a judicial ban on the corporate practice of medicine followed a similar analytical path. As the Minnesota Supreme Court summarized:
"When adopted by state courts, the general prohibition on corporate employment of licensed health care professionals has been based on a corporation's inability to satisfy the training and licensure requirements set out in state statutes and related public policy considerations.... The related public policy considerations underlying the prohibition on corporate practice of a profession include concerns raised by the specter of lay control over professional judgment, commercial exploitation of health care practice, and the possibility that a health care practitioner's loyalty to a patient and an employer will be in conflict." See Isles Wellness, Inc. v. Progressive Northern Ins. Co. , 703 N.W.2d 513, 517 (Minn. 2005).
Thus, the ban against the corporate practice of medicine took root in fear-fear that the quality of medical care would suffer from divided loyalty, lay control, and commercial exploitation. See People v. Cole , 38 Cal. 4th 964, 971, 135 P.3d 669, 44 Cal.Rptr.3d 261 (2006) ("Courts have said that the ban on the corporate practice of medicine 'is intended to ameliorate "the evils of divided loyalty and impaired confidence" which are thought to be created when a corporation solicits medical business from the general public and turns it over to a special group of doctors, who are thus under lay control.' "); Berlin v. Sarah Bush Lincoln Health Center , 179 Ill. 2d 1, 10, 227 Ill.Dec. 769, 688 N.E.2d 106 (1997) ("The prohibition on the corporate employment of physicians is invariably supported by several public policy arguments which espouse the dangers of lay control over professional judgment, the division of the physician's loyalty between his patient and his profitmaking employer, and the commercialization of the profession."); see also Huberfeld, Be Not Afraid of Change: Time to Eliminate the Corporate Practice of Medicine Doctrine , 14 Health Matrix 243, 251-52 (2004) (citing three "major concerns" that "played a part in creating and extending the corporate practice of medicine doctrine": divided loyalty, lay control over medical decision-making, and commercial exploitation of physicians).
This fear was sowed long ago by a special interest group, the American Medical Association (AMA). That the AMA formulated and promoted the doctrine as a form of economic protectionism is well-documented. See generally Gustavson & Taylor, At Death's Door-Idaho's Corporate Practice of Medicine Doctrine , 47 Idaho L. Rev. 479 (2011) ; Huberfeld, 14 Health Matrix 243 ; Freiman, 47 Emory L.J. 697 ; Chase-Lubitz, The Corporate Practice of Medicine Doctrine: An Anachronism in the Modern Health Care Industry , 40 Vand. L. Rev. 445 (1987). The AMA was created in the mid-1800s to legitimize the medical profession by imposing higher standards and weeding out the "quackery" of lay doctors. 40 Vand. L. Rev. at 449 ; 14 Health Matrix at 245-46. At first, the AMA worked to establish an ethical code, enact medical licensing statutes, and reform medical education. 40 Vand. L. Rev. at 450-55 ; 47 Idaho L. Rev. at 484-88. But soon the AMA became the medical profession's "central source of power and policy-making." 40 Vand. L. Rev. at 454.
In the early 1900s, "the AMA targeted a new economic threat to its member physicians and their control of the medical profession-the ever-increasing rate of corporate involvement in the practice of medicine." 47 Idaho L. Rev. at 488-89 ; see 40 Vand. L. Rev. at 455. As one scholar summarized, the corporate threat generally took two forms:
"In the first form, popularly known as contract practice, corporations employed physicians to serve the medical needs of employees. In the isolated industries of railroad, mining, and lumbering, doctors contracted to treat employees for a predetermined salary. Corporations in smaller *1270 and more urban industries contracted with independent physicians to provide medical care to the corporations' employees for a set rate per worker per month. Under both schemes the corporation dictated the choice of physicians.
"In the second form, known as corporate practice, for-profit medical service companies marketed physicians' services to the public. Corporate practice developed in its largest scale in Oregon and Washington in the early 1900s. Corporations in these states contracted with mining and lumber companies to provide medical services to company employees for a fixed rate per worker. The corporations first employed their own doctors to perform these services, but later subcontracted the work to independent doctors. Although physicians founded these corporations, eventually they were managed by lay people. Corporate management maintained limited control over the doctors with whom they contracted. Management required second opinions before surgery, reviewed the length of hospital stays, and refused to pay fees deemed excessive.
"Contract and corporate practice raised myriad concerns among the medical establishment. Contract or corporate practice, critics argued, would force doctors to maintain a high patient load and, thus, the quality of services delivered would deteriorate. Furthermore, fixed salaries and fees repudiated the traditional fee-for-service mechanism that allowed physicians to value their own services and, as a result, control their own income levels. Fixed salaries and fees paid for indefinite volumes of work, however, would result in low earnings and potential out-of-pocket expenses for physicians.
"Opponents of contract and corporate practice also complained that these schemes forced doctors to bid against each other for contracts, thus driving their reimbursements down to unconscionable levels. The schemes also threatened the profession's monopolistic designs by creating stiff competition with individual physicians and by permitting lay persons to make policy decisions concerning which patients a doctor could see and the amount of services a doctor could provide." 40 Vand. L. Rev. at 456-58.
See 47 Idaho L. Rev. at 489-90 ; 14 Health Matrix at 247-48.
In response, the AMA introduced the corporate practice of medicine doctrine. It did so "in an effort for doctors to gain better control over the medical profession and to prevent the commercialization of the profession through the introduction of profit-making incentives." 47 Emory L.J. at 697-98 ; see 40 Vand. L. Rev. at 455 (describing the corporate practice of medicine as a threat to physician autonomy and an unwanted source of competition). The AMA argued the corporate practice of medicine would cause physician loss of control and "would (i) divide physician loyalty between corporate employers and patients, (ii) introduce nonprofessional control over medical decision-making, (iii) and sacrifice quality medical care for the sake of for-profit considerations." 47 Idaho L. Rev. at 490-91. The AMA also wove the doctrine into its ethical code. 47 Emory L.J. at 701-03 ; 47 Idaho L. Rev. at 491-93. For example, one amendment to the code stated that any contract permitting a lay entity to profit directly from the provision of medical services is "'beneath the dignity of professional practice, is unfair competition with the profession at large, is harmful alike to the profession of medicine and the welfare of the people, and is against sound public policy.'" 47 Emory L.J. at 703 (quoting Laufer, Ethical and Legal Restrictions on Contract and Corporate Practice of Medicine , 6 Law & Contemp. Probs. 516, 519 [1939] ).
State courts, "heavily influenced by the AMA's articulation of the public policy concerns with the corporate practice of medicine, soon established corporate practice of medicine doctrines by expansively interpreting state medical practice acts as prohibiting the corporate practice of medicine." 47 Idaho L. Rev. at 493 ; see 14 Health Matrix at 252 (courts embraced the AMA's arguments against the corporate practice of medicine in the early 1900s). In sum, "the existence of the corporate practice of medicine doctrine is dependent upon sometimes strained interpretations of statutory language in light of the *1271 various public policy grounds which led the AMA to pursue the doctrine more than eighty years ago." 47 Emory L.J. at 732-33.
ANALYSIS
In light of this history, it is worth asking-does the public interest truly justify a judicial ban against the corporate practice of medicine? And was it our job to enter this policy debate (and side with one interest group) in the first place? Finally, what are the constitutional restraints-if any-on laws that exhibit naked rent-seeking? I will explore each question briefly in turn.
As today's case illustrates, when exceptions begin to swallow the rule, the original policy explanations for the rule become suspect. Courts across the country have chipped away at the doctrine by recognizing exceptions for professional corporations, hospitals, and the like:
"By 1971, all states had enacted statutes allowing physicians to practice through professional corporations, although such laws generally restrict share ownership to licensed professionals. Courts in jurisdictions with corporate practice bars have long taken judicial notice of the fact that hospitals and their affiliates employ physicians, and enforcement of restrictive doctrines in some of these jurisdictions is notoriously lax. In some jurisdictions, courts have gone out of their way to infer exceptions for specific practices, such as employment of physicians by teaching hospitals, private hospitals, federal military hospitals, and employers engaging 'company doctors' for employees." Fichter, Owning A Piece of the Doc: State Law Restraints on Lay Ownership of Healthcare Enterprises , 39 J. Health L. 1, 6-7 (2006).
Kansas also jumped on the bandwagon. First we recognized exceptions for professional corporations and licensed hospitals, and now we recognize one for licensed ASCs. In St. Francis , we held the corporate practice of medicine by licensed hospitals is "not contrary to the interest of public health, safety, and welfare." 254 Kan. at 746, 869 P.2d 606. Today we hold the same for licensed ASCs (and, by extension, for all licensed medical care facilities). And for good reason-it appears the Legislature authorized corporations to practice medicine in these ways to promote the public welfare .
I also question the viability of the corporate practice of medicine doctrine given the dramatic changes that have swept the healthcare industry since its inception. Put simply, with the rising costs of healthcare, the solo practitioner making house calls has become obsolete and the shift to integrated medicine is well underway. See 47 Emory L.J. at 738 ("The trend towards integration encompasses both the high level of merger activity among hospitals and the movement of physicians away from solo practices and toward group practices."); 14 Health Matrix at 257 ("Solo practitioners and small group practices increasingly are falling by the wayside as larger group practices and affiliations with hospitals become the norm, if for no other reason than the need for cost savings."). Furthermore, the modern healthcare market is dominated by corporate managed care organizations ( MCO) and their "cost-minimizing" approach. 47 Emory L.J. at 740 ; see Harris & Foran, The Ethics of Middle-Class Access to Legal Services and What We Can Learn from the Medical Profession's Shift to a Corporate Paradigm , 70 Fordham L. Rev. 775, 813 (2001) (explaining how "the old system of fee-for-service reimbursement and physician control over the delivery of medical services began to crumble" because of rising healthcare costs, paving the way for the rise of MCOs). Given this, the corporate practice of medicine doctrine seems impractical at best.
But even more troubling, the doctrine may deny access to medical services for rural and low-income populations. As one scholar explains, "[p]hysicians especially have a disincentive to practice in rural or remote areas, which inherently pose significant economic risks due to their size and disadvantaged status," and therefore, "[a] prohibition on the corporate practice of medicine limits the more efficient and economical forms in which a physician can practice ... effectively endangering rural access to health care." 47 Idaho L. Rev. at 518. As another scholar argues, "there is ample evidence that the doctrine raises prices and decreases access to *1272 legal and medical services, and there is no countervailing evidence that it increases the quality of services rendered." Robertson, Private Ordering in the Market for Professional Services , 94 B.U. L. Rev. 179, 225 (2014).
Finally, and perhaps most telling, the AMA was forced to lift its ethical ban against the corporate practice of medicine. Isles Wellness , 703 N.W.2d at 528 (Hanson, J., concurring in part, dissenting in part); 47 Emory L.J. at 710-11. In 1979, the Federal Trade Commission (FTC) determined the AMA engaged in unfair methods of competition by "keeping physicians from adopting what may be more economically efficient business formats" through its ethical bans on the corporate practice of medicine. Matter of the Am. Med. Assoc. , 94 F.T.C. 701, 1979 WL 199033, at *241 (1979) ; see 14 Health Matrix at 255-56. Ultimately, the FTC ordered the AMA to cease and desist from restricting such business formats. 1979 WL 199033, at *251. Thus, the ethical impetus for the doctrine no longer exists.
Because I suspect the doctrine has, at least, "been rendered meaningless and unnecessary by the fundamental changes that have occurred in the practice of medicine over recent decades," Isles Wellness , 703 N.W.2d at 525 (Hanson, J., concurring in part, dissenting in part), and has, at worst, created an aggregate public harm , I suggest on policy grounds alone the time has come for this court to abolish it. I echo the concern that
"[g]iven the changes which have occurred in the health care industry and the exceptions which states have carved out of their corporate practice bans, the public policy grounds which gave rise to the doctrine provide less of an imperative for the continued existence of the bans. Furthermore, the need for continued movement towards efficiency in the health care industry and the barrier that the doctrine places in front of progression towards efficiency make its continued existence imprudent." 47 Emory L.J. at 698.
But more importantly, the doctrine should be abolished because we had no business jumping into this policy debate in the first place. See Higgins v. Abilene Machine, Inc. , 288 Kan. 359, 364, 204 P.3d 1156 (2009) ("[W]e are not free to act on ... our view of wise public policy. We leave the guidance of public policy through statutes to the legislature."). Now, with the changing tides of healthcare delivery, it is time to send this debate back to the Legislature where it belongs. As Justice Edmonds presciently said when his colleagues on the California Supreme Court adopted the corporate practice of medicine doctrine:
"In recent years the subjects of health insurance and group medicine have been the frequent source of discussion and investigation, and both lay and professional opinion concerning them is sharply divided. The need for some such service, particularly for persons of low income, is conceded by all parties to the controversy. The courts, in the absence of legislation, should not on the ground of public policy place a stumbling-block in the way of working out this problem. It is not a proper function of the courts to thus block the natural growth of social and economic processes.
....
"It is claimed that the medical profession will be commercially exploited if private corporations interested solely in a profit are permitted to engage in activities such as are here involved. If that is an evil the solution rests with the legislature and not with the courts." People ex rel. State Bd. of Medical Examiners v. Pacific Health Corp. , 12 Cal. 2d 156, 164-65, 82 P.2d 429 (1938) (Edmonds, J., dissenting).
So too here. In the absence of legislation banning the corporate practice of medicine, I would not tether the doctrine to "the perilous sands of shifting public policy." Apodaca v. Willmore , 306 Kan. 103, 137, 392 P.3d 529 (2017) (Stegall, J., dissenting). Or, as Justice Hanson on the Minnesota Supreme Court put it: "I would decline to impose prohibitions where none has been imposed by the legislature." Isles Wellness , 703 N.W.2d at 526 (Hanson, J., concurring in part, dissenting in part).
As a final matter, I question whether a blanket ban on the corporate practice of *1273 medicine is constitutional under either our federal or state constitution. For one thing, "[c]ourts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." Craigmiles v. Giles , 312 F.3d 220, 224 (6th Cir. 2002) ; see, e.g., Patel v. Texas Department of Licensing and Regulation , 469 S.W.3d 69, 122 (2015) (Willett, J., concurring) (rejecting "[n]aked economic protectionism" as a constitutional government end). Here, the corporate practice of medicine doctrine was created at the behest of the AMA to protect its members from economic competition-arguably harming the public in the process. The doctrine might fail even the watered-down rational basis review typically applied when evaluating economic regulations under the United States Constitution. See, e.g., Merrifield v. Lockyer , 547 F.3d 978, 991 (9th Cir. 2008) (holding a licensing regulation that discriminated between pest-controllers based upon the type of pest controlled failed "the relatively easy standard of rational basis review" because it "was designed to favor economically certain constituents at the expense of others similarly situated").
If, for example, the following was established, rational basis may not be satisfied:
" '[E]vidence of an intent to benefit one group of people at the expense of others, i.e., protectionism; evidence refuting the law's ostensible public-interest rationale; the presence of less restrictive alternatives to satisfy the law's ostensible purpose; evidence showing a harm to competition and consumers; and, perhaps, evidence that the law may interfere with interstate commerce.' " 94 B.U. L. Rev. at 224 (quoting Agarwal, Protectionism as a Rational Basis? The Impact on E-Commerce in the Funeral Industry , 3 J.L. Econ. & Policy 189, 213 [2007] ).
Thus, courts inspecting economic regulations for constitutionality "need not be oblivious to the iron political and economic truth that the regulatory environment is littered with rent-seeking by special-interest factions who crave the exclusive, state-protected right to pursue their careers." Patel , 469 S.W.3d at 118 (Willett, J., concurring).
In the end, I acknowledge the present court inherited this unfortunate doctrine and has applied it on the basis of stare decisis. Furthermore, because no party asks us to overturn the doctrine today, I am compelled to concur with the majority. But I propose that "though no party in this case has asked us to reconsider these precedents, at some point, it behooves us to do so." Murphy v. National Collegiate Athletic Ass'n , 584 U.S. ----, 138 S.Ct. 1461, 1487, 200 L.Ed.2d 854 (2018) (Thomas, J., concurring). And at that point, I would discard the doctrine.